STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NUMBER 2021 CA 0193


THE SUCCESSION OF ERNEST E. DOPP


Judgment Rendered: ___OCT 1 8 2021___


Appealed from the
Twenty-Second Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Docket Number 2019-31123 c/w 2019-31125, Division "A"


Honorable Raymond S. Childress, Judge Presiding


*************


| | |
|---|---|
| Anthony V. Ligi, Jr.<br>Metairie, LA | Counsel for Appellant,<br>Nora Friscia |
| Christie L. Tournet<br>Mandeville, LA | Counsel for Appellee,<br>Jolene Dopp Garcia, daughter of<br>Decedent, Ernest E. Dopp |


*************


BEFORE: WHIPPLE, C.J., PENZATO, AND HESTER, JJ.

ahp Penzato, J., concurs

**WHIPPLE, C.J.**

This succession matter is before us on appeal by Nora Friscia, the ex-wife of the decedent, challenging the trial court's judgment removing her as Executrix of the decedent's estate, vacating the order of probate of a purported olographic will, nullifying a purported donation *inter vivos*, and naming the decedent's daughter, Jolene Dopp Garcia, as Administratrix. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

Mr. Ernest E. Dopp died on November 22, 2019. Although he was not married at the time of his death, Mr. Dopp was previously married to Nora Friscia, from whom he was divorced in 1997. Mr. Dopp and Nora had four children: Ernest Dopp, Jr., who predeceased him; Jolene Dopp Garcia; Colinda Dopp Burke; and Addie Dopp Evans. It is undisputed that Nora and Mr. Dopp did not stay in contact with each other after their divorce.

Mr. Dopp lived with his daughter, Addie, from March 2017 until August 10, 2018, when he was asked to leave her house to go and stay with a different daughter, Colinda. However, when Colinda appeared to pick up her father from Addie's home, Nora was with her. Three days later, on August 13, 2018, Mr. Dopp executed a purported olographic will and Act of Donation and Lease, leaving the entirety of his estate to Nora, to the exclusion of his daughters.

By order of the court on December 3, 2019, the purported olographic will was probated and Nora was appointed as the Executrix of Mr. Dopp's estate. Thereafter, Jolene filed a petition to oppose the probate of the will, to vacate Nora's appointment as Executrix of the estate, to nullify the purported donation to

Nora, and to request that she be appointed Administratrix of the estate.[1] The matter proceeded to trial on March 12, 2020. At the trial, various documents were admitted into evidence, including the purported olographic will and Act of Donation, as well as some of Mr. Dopp's medical records. The trial court also heard testimony from several witnesses.

At the conclusion of the trial, the trial court took the matter under advisement, and invited the parties to submit post-trial memoranda on the issues. Thereafter, the trial court issued reasons for judgment on May 21, 2020, concluding that the olographic will was invalid, due to both issues of form and a lack of capacity based on Mr. Dopp's dementia and lack of medication. The trial court similarly found that the Act of Donation was also invalid, due to lack of capacity, undue influence, and lack of gratitude by Nora. On June 18, 2020, the trial court signed a judgment in accordance with its reasons, declaring the Act of Donation and olographic will null; vacating the Letters of Administration issued to Nora, the Order of Probate of Olographic Will, and Nora's appointment as Executrix; and appointing Jolene as Administratrix of Mr. Dopp's estate.

From this judgment, Nora appeals, contending that the trial court committed manifest error by:

(1) finding that she failed to prove the olographic will was entirely written, dated, and signed by Mr. Dopp;

(2) finding that the appellee met her burden of proof and showed that Mr. Dopp lacked capacity to comprehend generally the nature and consequences of the dispositions in the olographic will;

---

[1] On December 3, 2019, Jolene also filed a "Petition and Request for Notice of Application for Appointment of Succession Administrator," which she stated she attempted to file on December 2, 2019, but was unable to do so due to an issue with the trial court's e-file website. Because the two petitions were submitted on the same day, but sent to different judges of the 22nd Judicial District Court, Jolene requested that the two proceedings be consolidated, and the trial court signed an order to consolidate the proceedings on December 23, 2019.

3

(3) finding that the appellee met her burden of proof and showed that Mr. Dopp lacked capacity to comprehend generally the nature and consequences of the dispositions in the Act of Donation; and

(4) finding that the Act of Donation was null and void due to undue influence and/or lack of gratitude by Nora.

## DISCUSSION

### Form of Olographic Will
### (Assignment of Error No. 1)

On appeal, Nora first contends that the trial court committed manifest error when it found that she failed to prove the olographic will was entirely written, dated, and signed by Mr. Dopp.

There are two forms of testaments: olographic and notarial. LSA-C.C. art. 1574. An olographic testament is one entirely written, dated, and signed in the handwriting of the testator. LSA-C.C. art. 1575. In addition to the form requirements, an olographic testament must contain testamentary intent, which is to say, "it must, by its own language, show on its face that it purports to dispose of the property of the testator on his death." In re Succession of White, 2006-1002 (La. App. 1st Cir. 5/4/07), 961 So. 2d 439, 441, quoting Succession of Shows, 158 So. 2d 293, 295 (La. App. 1st Cir. 1963), affirmed, 166 So. 2d 261 (La. 1964). A valid olographic testament must do more than express or explain the wishes or desires of a decedent; the document must show intent to convey the decedent's property by the instrument itself. In re Succession of Cannon, 2014-0059 (La. App. 1st Cir. 3/25/15), 166 So. 3d 1097, 1102, writ denied, 2015-0816 (La. 6/5/15), 171 So. 3d 948. The olographic testament must be proved by the testimony of two credible witnesses, and the court must satisfy itself, through interrogation or from the written affidavits or the depositions of the witnesses, that the handwriting and signature are those of the testator. LSA-C.C.P. art 2883(A).

4

The proponent of an olographic will has the burden of proving its authenticity and its compliance with all of the formal requirements of law. LSA-C.C.P. art. 2903. In will contest cases, absent a finding of manifest error, the factual findings of the trial court are accorded great weight and will not be disturbed on appeal. In re Succession of Caillouet, 2005-0957 (La. App. 4th Cir. 6/14/06), 935 So. 2d 713, 715, writ denied, 2006-1732 (La. 10/6/06), 938 So. 2d 85.

The plaintiff in an action to annul a probated testament has the burden of proving the invalidity thereof, unless the action was instituted within three months of the date the testament was probated. In the latter event, the defendants have the burden of proving the authenticity of the testament, and its compliance with all of the formal requirements of the law. LSA-C.C.P. art. 2932. In the instant case, because Jolene filed her petition to annul the probated olographic testament within three months of the date that the testament was probated, Nora bore the burden of establishing the authenticity of the testament and its compliance with all of the formal requirements of law. See Succession of Achee, 2016-0716 (La. App. 1 Cir. 8/16/17), 229 So. 3d 5, 8. In reviewing a trial court's factual findings when ruling on a petition to annul a testament, an appellate court applies the manifest error standard of review. Id.

In the instant case, the trial court stated in its written reasons for judgment that the will was invalid, in part, because "[t]wo daughters testified that they did not recognize their father's signature, and there is no consistent testimony regarding the presence of the witnesses to the signing of the document." After careful review of the record, we find no manifest error in the trial court's conclusion that the will was invalid and that Nora, as the proponent of the olographic will, failed to meet her burden of proving its authenticity.

Nora argues on appeal that the fact that Mr. Dopp "hand wrote out the detailed dispositions" of his alleged will was not challenged, nor was the dating of the will. Instead, only the signature was challenged. She maintains that where it is undisputed that the dispositions were clearly in Mr. Dopp's handwriting, a witness actually saw him sign the will, and three other witnesses attested to the fact that it was his signature at the bottom of the will, the evidence presented at trial "clearly reflects" that she met her burden of proving the validity of the will under LSA-C.C.P. art. 2883. Thus, she contends the trial court's conclusion that the will was invalid was manifestly erroneous and clearly wrong.

However, at trial, both Jolene and Addie adamantly testified that the signature was not their father's signature. Jolene testified that while the body of the will was in his handwriting, the signature was not. She testified that she was very familiar with his signature because she would forge it on report cards as a child and that his signature was very difficult to write because "it just flowed really, really well." She testified that the signature on the will, however, looked like a "drawn signature where each letter seems to be drawn and not written." Addie testified that she also knew "right away" that the signature on the will was not her father's signature. She pointed out that: Mr. Dopp wrote with a "slant," which was missing from the signature; the P's in his last name were written incorrectly; and the "double line in the E, R, and N" should not have been there. Addie further noted that when comparing the signature on the will to Mr. Dopp's signature on the title to his car, the signature on the will looks different than his signature on the title.

Conversely, Nora, Colinda, and Colinda's husband, Ryan Burke, maintained that the signature was Mr. Dopp's signature. Ryan testified that Mr. Dopp wrote the will at his home in Slidell and that he saw Mr. Dopp actually sign and date the will in his presence. He stated that Mr. Dopp started to sign the will in pencil, but

Ryan thought he should sign it in pen, so he gave Mr. Dopp a pen instead. Colinda testified that she saw her father writing the will, but did not actually see him sign it. She further stated that her father's handwriting was "very creative," and that it was his signature on the page.

Nora testified that she "would recognize" Mr. Dopp's handwriting and that, in fact, the signature on the will was Mr. Dopp's. When she presented the will for probate, Nora filed an affidavit initially stating that she "personally witnessed the writing and execution of the olographic will by [Mr.] Dopp." Despite these representations in her affidavit, Nora presented conflicting testimony at trial and her deposition. At trial, she testified that she actually saw Mr. Dopp sign the will; however, in her earlier deposition testimony, she stated that she did not know when he signed the will, but claimed that it was signed when they went to the attorney's office to execute the donation. Specifically, Nora stated "I was with him but I don't know when he signed this will. I was not behind him saying look, here's a pen, sign this will."

Considering the conflicting testimony and evidence presented at trial, we are unable to say that the trial court was manifestly erroneous in finding that the will was invalid, particularly where there were conflicts in the testimony regarding the authenticity of the signature on the will and the presence of witnesses when the will was signed. In declaring the will invalid, the trial court clearly accepted and credited the testimony of Mr. Dopp's daughters, Jolene and Addie, over the testimony of his ex-wife, Nora, Colinda, who reluctantly took in her father, and Colinda's husband, Ryan, finding the testimony of certain witnesses more credible than others. Where, as here, there are two permissible views of the evidence, the fact finder's determinations are entitled to great deference and cannot be said to be manifestly erroneous in the absence of objective evidence to the contrary. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). The trial court's finding that the will

7

was invalid was based on a credibility call between the two groups of witnesses. Finding no manifest error herein, we decline to disturb the trial court's findings and conclusion that Nora failed to meet her burden of proving the olographic will was valid.

Accordingly, this assignment of error lacks merit.[2]

## Invalidity of Act of Donation for Lack of Capacity and Undue Influence or Lack of Gratitude (Assignments of Error Nos. 3 and 4)

Nora next contends that the trial court committed manifest error when it found that the Act of Donation[3] was null and void due to Mr. Dopp's lack of capacity and her undue influence and/or lack of gratitude towards Mr. Dopp.

A donation *inter vivos* shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor. LSA-C.C. art. 1479. A person who challenges a donation because of fraud, duress, or undue influence must prove it by clear and convincing evidence. However, if, at the time the donation was made, a relationship of confidence existed between the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence. LSA-C.C. art. 1483.

Such undue influence can result from physical coercion and duress, or more subtle influences such as creating resentment toward a natural object of a bounty by false statements. Mere advice, persuasion or kindness and assistance should not

---

[2]Because we find no error by the trial court in its conclusion that the will was invalid on this basis, we pretermit discussion of Nora's contention in her second assignment of error that the trial court incorrectly found the will invalid based on Mr. Dopp's lack of capacity and inability to understand the dispositions made in the will.

[3]The parties also signed a purported lease of the immovable property that was the subject of the donation. Any issues regarding the validity of the purported lease are not before us in this appeal.

constitute influence that would destroy the free agency of a donor and substitute another's volition for his own. See LSA-C.C. art. 1479, Revision Comments-1991, comment (b). Further, although generally irrevocable, see LSA-C.C. art. 1468, a donation may be revoked on account of ingratitude if the donee has attempted to take the life of the donor, or has been guilty towards him of cruel treatment, crimes, or grievous injuries toward the donor. See LSA-C.C. arts. 1556 & 1557.

A trial court's factual finding as to the issue of undue influence and ingratitude is fact intensive and cannot be disturbed on appeal in the absence of manifest error. Allen v. Edmond, 2018-1151 (La. App. 1st Cir. 5/14/19), 277 So. 3d 359, 361. Under the manifest error standard of review, a reviewing court may not merely decide if it would have found the facts of the case differently. Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC, 2014-2592 (La. 12/8/15), 193 So. 3d 1110, 1115. Reversal is only warranted if the appellate court finds that no reasonable factual basis for the trial court's finding exists in the record, and that the finding is clearly wrong. In re Succession of Gilbert, 37,047 (La. App. 2nd Cir. 6/5/03), 850 So. 2d 733, 736.

As it relates to this assignment of error, the trial court found that the donation *inter vivos* was invalid due to Nora's undue influence and lack of gratitude, noting, *inter alia*, she "sent him back to his daughters after obtaining the documents she desired" and she did not give any one "any information regarding the [donation], nor were copies given to [Mr.] Dopp." Considering the record in its entirely, we find that the court's conclusion as to the issue of undue influence is not clearly wrong or manifestly erroneous.

Nora argues on appeal that because she was not related to Mr. Dopp by affinity, consanguinity, or adoption, Jolene's burden of proving undue influence was by clear and convincing evidence and that she failed to do so. Nora contends that Jolene's evidence fails to satisfy this standard, because she relied solely on one

9

text message sent "in frustration" to show ingratitude,[4] when Nora actually stayed in contact with Mr. Dopp after the text message was sent. Relying on the testimony of Mr. Dopp's next door neighbor, Ms. Stacey Dumser, Nora further contends that the evidence shows that she did not unduly influence Mr. Dopp into leaving his property to her because he always intended to do so.

Conversely, Jolene contends that, although the evidence is sufficient to meet the clear and convincing evidence burden of proof, because Nora was acting as a caregiver for Mr. Dopp, only a preponderance of the evidence standard was required under LSA-C.C. art. 1483. Jolene maintains that both undue influence and ingratitude were clearly established herein, where the evidence reflects that Nora, Mr. Dopp's remarried ex-wife, with whom he had not kept in contact with after their divorce, "entered the picture at the very moment" Mr. Dopp had to leave his daughter's home due to "dementia complications." Jolene further points out that while Mr. Dopp was only supposed to go and stay with Colinda, Nora instead "took possession" of him, procured the will and act of donation, and, within two months, dropped him back off at his own home and told him to leave her alone.

The record shows that the circumstances surrounding Nora's reentry into Mr. Dopp's life were such that she involved herself in his affairs and served as a caretaker of sorts for him, at least for a period of time. Thus, "a relationship of confidence" existed between Nora and Mr. Dopp such that undue influence need only be established by a preponderance of the evidence. See Kinney v. Bourgeois, 2006-2384 (La. App. 1st Cir. 9/14/07), 2007 WL 2686113, at *11 (unpublished) (finding that a "relationship of confidence" existed between the decedent and her hairdresser, who briefly assisted her by looking after her affairs and taking care of her). See also Succession of Braud, 94-0668 (La. App. 4th Cir. 11/17/94), 646 So.

_____

[4] Although denied in part by Nora, the text message Nora sent to Mr. Dopp read, "They're back at your house and don't bother me anymore. I'm done with you, user."

10

2d 1168, 1172, writ denied, 95-0383 (La. 3/30/95), 651 So. 2d 841 (finding that a preponderance of the evidence was the applicable burden of proving undue influence when a "relationship of confidence" existed between the decedent and her caretaker, who were not otherwise related).

While the evidence of Mr. Dopp's mental and physical state leading up to and after the events in question amply supports the trial court's finding that Mr. Dopp was subject to undue influence at the time he executed the act of donation, on the record before us, we find the evidence was sufficient to establish undue influence under either standard. The record clearly shows that Mr. Dopp suffered from dementia, depression, anxiety, and seizures, and that at the time the act of donation was executed, he was prescribed the highest recommended dose of donepezil, a dementia medication. Moreover, Nora does not dispute that she and Mr. Dopp did not remain in contact with each other after their divorce in 1997. She testified that she did not know he previously suffered from cancer, but admitted that prior to seeing him in August 2018, she was told by her daughter that Mr. Dopp suffered from dementia and seizures.

Mr. Dopp moved in with his daughter, Addie, in March 2017, and stayed with her until August 10, 2018. Additionally, Jolene, moved back to Louisiana in 2017 to help Addie take care of him. While Mr. Dopp lived at Addie's home, Jolene, Addie, and Addie's husband, Kirk, were responsible for bringing him to his doctor's appointments, making sure he took his medications twice a day, and calming him down when he became "emotional." Jolene testified that over time, Mr. Dopp became increasingly confrontational and would say inappropriate things because his "filters started to disappear" as his dementia progressed. Due to the increased difficulty in caring for Mr. Dopp, Addie and Jolene decided they needed Colinda's help, even though she was "resistant" to helping. Jolene testified that Mr. Dopp was formally evicted from the residence in an effort to get Colinda to

11

help care for him, and they were trying to "move the situation forward" because Mr. Dopp felt entitled to stay at Addie's and "didn't want to compromise." Jolene also stated that on the day he moved his belongings out of the house, tensions were "very, very high" and Mr. Dopp was being "very hostile" because he was so upset.

Mr. Dopp began staying at Colinda's house approximately one week before the eviction. However, Addie and Jolene were unaware that Nora was also staying at Colinda's house at that time. On August 6, 2018, Nora and Mr. Dopp had their first appointment with Mathieu Daigle, the attorney who drafted the donation *inter vivos*. A mere three days after his eviction and relocation to Colinda's house, Mr. Dopp and Nora returned to Mr. Daigle's office on August 13, 2018, to execute the act of donation. Nora and Mr. Daigle testified that Nora was present at both meetings; however, Mr. Daigle testified that he spoke with Mr. Dopp alone when they got to "more personal matters," while Nora claimed that she was present for the entirety of both meetings.

Mr. Daigle testified that he felt Mr. Dopp was "in his right mind" at the time, and was able to express his intent and reasons for executing the donation. Mr. Daigle stated that he did not detect any pressure from Nora to execute the documents. However, he also testified that he was not made aware of Mr. Dopp's earlier dementia diagnosis and that he has never executed a will for a client with dementia. Mr. Daigle testified that because the donation involved Mr. Dopp and his ex-wife, he advised Mr. Dopp to take the documents home, reflect on whether he truly wanted to execute them, and if so, take the documents to a separate notary to execute them. However, instead of following Mr. Daigle's advice, Nora took Mr. Dopp to another notary's office immediately after leaving Mr. Daigle's office and executed the act of donation. Nora testified that she immediately brought him to another notary, despite Mr. Daigle's instructions, because she "needed witnesses to show that [Mr. Dopp] was in his right mind... when he did the transfer."

In explaining the circumstances surrounding the Act of Donation and the absence of undue influence in Mr. Dopp's decision to give her his property, Nora claimed that Mr. Dopp wanted her to inherit his estate and to donate his property to her because he "did her wrong and wanted to make it right." However, she also gave conflicting testimony as to Mr. Dopp's state of mind when the donation was executed. At one point, Nora testified that she did not know why he wanted to give her his belongings, but that he was not angry when he decided to execute the documents; later, she stated that his mind was made up "because he was so angry at the time," likely due to the eviction. Additionally, in her deposition, Nora testified that she did not think Mr. Dopp owed her anything, but in a different pleading filed with the trial court, Nora set forth that the property left to her was primarily paid for during her marriage to Mr. Dopp and there was "no evidence that [the parties] entered into a community property partition at the time of their divorce."

Nora intially claimed that the community property was never partitioned. However, when presented with evidence of the community property partition, she testified that "it didn't get nowhere" and that she never received the settlement, even though she signed the consent judgment. These statements by Nora were contradicted by Addie's testimony that after Nora went to court the day the divorce was finalized, she came home with the money and spent it on a camcorder. Although Nora stated that Mr. Dopp wanted her "to have ownership of the property... because she helped pay for it," she also testified at trial that she felt as though she deserved to inherit Mr. Dopp's estate.

After the donation was executed, Mr. Dopp lived with Nora and her new husband for a short time. While he lived with Nora, he undisputedly was not taking his dementia medication, and Nora candidly stated she did not help him take the medication he had with him. Mr. Dopp's neighbor, Ms. Dumser, testified that

13

she was sure he was taking his medication when he was at Nora's because "you could hear it in his voice" if he was or was not taking it. Despite Ms. Dumser's apparently mistaken testimony regarding Mr. Dopp's medication, Nora relies on her testimony to show a lack of undue influence in that he "always" wanted to give his estate and property to her.

Nora also did not give a copy of the donation or the will to Mr. Dopp, and instead kept the only copies of the documents in her possession until after his death. Mr. Dopp's sister, Jan Moran, testified that Mr. Dopp would come to see her on her birthday and if he had a problem. When he visited her for the last time in December 2018, he told her he "did something" and needed her to fix it because it was "bad." Ms. Moran testified that Mr. Dopp told her he signed some papers, but he did not know what they were, and he could not give the papers to her because Nora had them. Ms. Moran also testified that he insisted he did not sell anything, but he was not sure if he still had a home, even though he was living at the home. She also stated that Mr. Dopp told her Nora and her husband were taking care of him, and he "got lucky" with Nora on his birthday, but they told him that if he did not sign the papers, he had to leave their house.

Jolene also testified that Mr. Dopp told her about some paperwork he signed, but that he thought he still owned all his property and also had a usufruct, but he did not have copies of the papers and could not get any because Nora had them. She said that Mr. Dopp was unable to even tell her where he went to get the paperwork done. Additionally, she stated that Mr. Dopp alluded to the fact that something sexual had happened with Nora and Mr. Dopp.

The record demonstrates that Mr. Dopp was clearly suffering from numerous health issues, including dementia, which had progressed to the point that he was prescribed the highest dosage of medication, and that he was very upset upon being evicted from Addie's house and being asked to live with Colinda. The record

14

further shows that during this time, his ex-wife whom he was previously married to for twenty years, returned to his life at a time when he was most vulnerable to influence due to his illness and the unwelcome change in his living arrangements. While Nora claimed that Mr. Dopp gratuitously wanted to leave her his belongings and transfer ownership of his home to her via a donation *inter vivos*, other evidence presented at trial demonstrated that Mr. Dopp was unsure of the effect of the documents he signed, and that he felt that if he did not sign the documents, Nora would no longer aid in his care. Additionally, shortly after coming into Nora's care, Nora went with him to both meetings with his attorney, yet did not follow the advice of counsel, namely, that he should wait and think over the donation before executing it. Instead, she took him directly to a notary's office to immediately complete the donation. While the rendition of these actions to a donor without such a vulnerable disposition could be viewed purely as helpful assistance or mere persuasion, Mr. Dopp was in a difficult situation and vulnerable to these seemingly innocuous acts, which were accomplished in Nora's favor due to his diminished mental state, vulnerability, and sudden life changes. See Kinney, 2007 WL 2686113, *15.

Considering the foregoing and the record as a whole, we cannot say that the trial court was clearly wrong or manifestly erroneous in finding that the August 13, 2018 Act of Donation procured by Nora was the product of undue influence by her; nor do we find error in the trial court's conclusion that as such, the act of donation was invalid and should be nullified.[5]

Accordingly, these assignments of error also lack merit.

---

[5] Given our finding of undue influence, we pretermit consideration of whether Nora was guilty of ingratitude, such that the donation should be revoked on this basis.

15

## CONCLUSION

Based on the above and foregoing reasons, the trial court's June 18, 2020 judgment removing Nora Friscia as Executrix of the Succession of Ernest E. Dopp; vacating the order of probate of the August 13, 2018 purported olographic will and the issuance of letters of administration to Nora Friscia; declaring the Act of Donation *inter vivos* executed by Ernest E. Dopp on August 13, 2018 in favor of Nora Friscia null and invalid; and naming Jolene Dopp Garcia, as Administratrix of the Succession of Ernest E. Dopp is hereby affirmed in its entirety. Costs of this appeal are assessed to the appellant, Nora Friscia.

**AFFIRMED.**